# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | |
|---|---|
| **BAKER DC, LLC,** | * |
| Plaintiff, | * |
| v. | * Case No.: PWG-17-2041 |
| **BAGGETTE CONSTRUCTION, INC. et al.,** | * |
| Defendants. | * |

## MEMORANDUM OPINION

This is a dispute between a general contractor and one of its subcontractors on a federal construction project. The general contractor, Baggette Construction, Inc. ("Baggette"), has filed a Motion for Partial Summary Judgment, asking this Court to issue two findings as a matter of law. It first seeks a finding that a bid proposal submitted by the subcontractor, Baker DC ("BDC"), before the parties executed a written subcontract was not itself a part of the final agreement. It next urges the Court to find that BDC is unable to produce evidence of a kind necessary to prove damages for delay and disruption.

I agree with Baggette as to the first issue and hold, as a matter of law, that BDC's bid proposal is not a part of the subcontract (though it may conceivably be admissible to clarify ambiguities in the written agreement). I decline, however, to declare at this stage of the proceedings that BDC's attempts to establish damages in the manner of its choosing are inadmissible. Baggette's motion is, accordingly, granted in part and denied in part.

## FACTUAL BACKGROUND

Baggette was the general contractor on a federally funded project to renovate and expand a shopping center at Joint Base Andrews in Prince George's County, Maryland. Baggette Mem. 1, ECF No. 53-1. The dispute in this case concerns Baggette's subcontract with BDC, which called for BDC to provide the concrete needed for the project. *See* Compl. ¶ 8, ECF No. 1.

BDC submitted a bid proposal to Baggette on September 24, 2015, outlining the work it would perform and proposing a price for its services. *See* ECF No. 54-1. The proposal included a list of "qualifications," one of which stated: "B-DC's bid proposal is conditioned on the parties reaching a mutually agreeable subcontract after B-DC's review of all the relevant contract documents and an opportunity to negotiate the subcontract's terms, if any." *Id.* at 5. Two other qualifications touched on scheduling matters. One stated: "This proposal is priced based on 1 mobilizations [sic], an estimated start date of November 1, 2015 and a specified concrete duration of 13 working weeks from start to top-out, assuming a standard 40-hour workweek (Monday through Friday)." *Id.* at 4. A second added: "This proposal is based on a timely mobilization. B-DC cannot mobilize until there is a sufficient and continuous amount of work to meet the productivities as bid." *Id.* at 5.

BDC revised its proposal four days later. See ECF No. 53-2. This version contained the same three qualifications but increased the expected duration of the project from 13 weeks to 16 weeks. *Id.* at 4.

Of the two companies that submitted bids for the subcontract, BDC offered the lowest price. *See* ECF No. 54-2. Baggette responded to BDC via email on September 30, 2018, enclosing a "letter of intent" to award the subcontract to the company for $1,269,600. Letter of Intent, ECF

No. 54-4. The concluding paragraph stated: "A formal subcontract agreement shall be forthcoming. Please proceed with all submittals immediately." *Id.*

The parties executed a written subcontract agreement on October 9, 2015, entitling BDC to $1,282,296 in exchange for its work on the site. *See* Subcontract & Rider 1, ECF No. 1-1. The writing did not specify how long BDC would have to complete its work, but several provisions established Baggette's control over the work schedule. Section 1, for starters, explained that the work was "to be scheduled by [the] Baggette Construction superintendent or project manager as outlined in the construction schedule and as updated." *Id.* Section 4 further specified:

> The Subcontractor [BDC] shall commence the Work when notified to do so by the Contractor and shall diligently and continuously prosecute and complete the Work and coordinate the Work with the other work being performed on the Project, in accordance with those project schedules as may be issued from time to time during the performance of the Work, and any other scheduling requirements listed in this Agreement, so as not to delay, impede, obstruct, hinder or interfere with the commencement, progress or completion of the whole or any part of the Work or other work on the Project.

*Id.* at 2. Section 13, likewise, obligated BDC to "keep up the general progress of the Project in accordance with a Progress Schedule as prepared by the Contractor or their representative or as otherwise might be communicated." *Id.* at 5.

The agreement's final provision, Section 24, was an integration clause. *See id.* at 9. This stated in relevant part: "This Agreement constitutes the entire agreement between the parties hereto. No oral representations or other agreements have been made by Baggette Construction except as stated in the Agreement." *Id.*

A subsequently executed rider clarified the parties' obligations with regard to scheduling. *See id.* at 13-15. In particular, one provision stated:

> Notwithstanding any of the above, any modifications to the Project Schedule shall be reasonable and normal for the type of Work of this

3

> agreement, such that Scheduled durations for the Subcontractor's
> work shall not be significantly changed. Any such modifications
> that significantly change the Subcontractor's scheduled durations
> and impact the cost of the Work shall cause the Contractor to issue
> a change order for a time extension and for reimbursement of the
> reasonable cost of the impact, unless agreed by both parties.

*Id.* at 13. A related provision expressly limited Baggette's right to recover damages for any delays that might be attributable to BDC. *See id.* at 14. This provision stated in part: "Delays incurred by the Subcontractor, beyond its control shall be considered excusable delays and result in reasonable time extensions and reimbursement of related costs, to the Subcontractor, unless such delays are beyond the control of Baggette Construction, i.e. weather." *Id.*

The work – at least, from BDC's perspective – did not proceed as planned. As of July 2018, nearly three years after the parties executed the subcontract, BDC's work on the site was not yet complete. *See* ECF No. 55-2. A Baggette executive acknowledged, at that point, that BDC had "been on the job periodically for two-plus years from time to time." *Id.*

BDC brought this lawsuit against Baggette in July 2017, asserting two claims of breach of contract. *See* Compl. ¶¶ 25-37. Count I of the Complaint alleged that Baggette had "seriously delayed and disrupted" its work on the site, costing the subcontractor several hundred thousand dollars. *Id.* ¶ 6. Count II accused Baggette of failing to pay for additions or revisions to the scope of BDC's work once the project was under way, despite BDC's submission of several potential change orders ("PCOs").[1] *See id.* ¶¶ 17-19. BDC filed a separate suit against the Hartford Fire

---

[1] The Complaint accused Baggette of breaching an implied duty of good faith and fair dealing. *See* Compl. ¶ 33. Maryland, though, does not recognize a separate cause of action for breach of this implied covenant, viewing it instead as part of a breach of contract claim. *See Reed v. Bank of Am. Home Loans*, No. PJM 13-3265, 2016 WL 3218720, at *10 (D. Md. June 10, 2016) (citing *Magnetti v. Univ. of Md.*, 909 A.2d 1101, 1105 n.3 (Md. Ct. Spec. App. 2006), *aff'd*, 937 A.2d 219 (Md. 2007)). When Plaintiff's counsel conceded in a telephone conference call that Count II could be construed as a breach of contract claim, I informed the parties that I would interpret this count as such. ECF No. 21.

Insurance Co., the surety for Baggette's prime contract on the federal construction project. *See* Compl., *United States ex rel. Baker DC, LLC v. Hartford Fire Ins. Co.*, No. 17-2122-PWG (D. Md. July 27, 2017), ECF No. 1. I consolidated the two cases in an October 11, 2017 letter order. ECF No. 21.

Baggette's ensuing Motion for Partial Summary Judgment asks this Court for two findings as a matter of law. *See* Baggette Mem., ECF No. 53-1. It first seeks a finding that BDC's bid proposal is not itself a part of the subcontract. *See* Reply 8, ECF No. 56. It next seeks a finding that BDC cannot establish claims for delay and disruption damages because it has determined not to present expert testimony or a "critical path method" ("CPM") analysis.

The parties have fully briefed their arguments. *See* ECF Nos. 53-56. No hearing is necessary. *See* Loc. R. 105.6.

## STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates – through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" – that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317, 324 (1986). A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin v.*

*Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *See id.*

## DISCUSSION

Baggette's motion presents two issues: (1) whether BDC's bid proposal is part of the subcontract, and (2) whether BDC can establish its entitlement to damages under Count I without presenting expert testimony or a CPM analysis. I will address each of these issues in due course.

### A.

This being a contract case, there is a threshold matter that warrants some attention. This is: which state's laws govern the legal issues Baggette has presented? The subcontract does not contain a choice-of-law provision, and the parties have not discussed the issue in their briefs.

The choice-of-law inquiry hinges on the source of the court's jurisdiction. Here, the Court's power to hear this case derives from two sources. One is 28 U.S.C. § 1332, which endows federal district courts with jurisdiction over lawsuits "where the matter in controversy exceeds the sum or value of $75,000" and the parties are citizens of different states. 28 U.S.C. § 1332(a); *see* Compl. ¶ 3. The second source of jurisdictional authority in this case is the Miller Act, 40 U.S.C. § 3131 *et seq.*

"The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law." *F. D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 127 (1974). Here, though, where the parties contest the existence or interpretation of a contract, rather than the construction of the federal

statute, the federal court must look to the forum state's choice-of-law rules. *See Artistic Stone Crafters v. Safeco Ins. Co.*, 726 F. Supp. 2d 595, 600 (E.D. Va. 2010); *Austin Elcon Corp. v. Avco Corp.*, 590 F. Supp. 507, 511 (W.D. Tex. 1984). The federal diversity jurisdiction statute would have me do the same. *See Montage Furniture Servs., LLC v. Regency Furniture, Inc.*, 966 F. Supp. 2d 519, 523 (D. Md. 2013). That being so, I will apply the choice-of-law rules from the forum state, which, here, is Maryland.

In contract cases, Maryland ordinarily "follows the doctrine of *lex loci contractus*, applying the substantive law of the place where the contract was formed." *RaceRedi Motorsports, LLC v. Dart Mach., Ltd.*, 640 F. Supp. 2d 660, 665 (D. Md. 2009). For choice-of-law purposes, the place of formation is said to be the state "where the last act necessary to make the contract binding occurs." *Montage*, 966 F. Supp. 2d at 523 (quoting *Blanch v. Chubb & Son, Inc.*, No. CCB-12-1965, 2013 WL 4026919, at *2 (D. Md. Aug. 6, 2013)). Here, the parties have not specified in their briefs precisely where this last act occurred. The subcontract itself, though, indicates the agreement was "made" at a particular address in Washington, D.C. *See* Subcontract & Rider 1.

Were I to stop there, it would appear to be my duty to decide this case under Washington, D.C. law. But there is more. Maryland, whose choice-of-law rules apply here, "recognizes a limited 'renvoi' exception to the lex loci contractus principle." *Montage*, 966 F. Supp. 2d at 523. Under this exception, the court

> should apply Maryland substantive law to contracts entered into in foreign states' jurisdictions in spite of the doctrine of lex loci contractus when:
> 1) Maryland has the most significant relationship, or at least, a substantial relationship with respect to the contract issue presented; and
> 2) The state where the contract was entered into would not apply its own substantive law, but instead would apply Maryland substantive law to the issue before the court.

7

*Id.* at 523-24 (quoting *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 659 A.2d 1295, 1304-05 (Md. 1995)).

Here, there can be no question that Maryland has a "substantial relationship with respect to" the legal issues Baggette's motion presents. *Id.* at 523. Baggette was the general contractor on a construction site in Maryland, and its motion here concerns the scope of a subcontract for work on that site. Plainly, the first prong of the two-part *renvoi* test is satisfied.

The second prong looks to Washington, D.C.'s choice-of-law rules. Under D.C. law, a court presented with a conflict-of-law problem applies a multi-factor test known alternatively as the "government interest" test or "more substantial interest" test. *Chicago Ins. Co. v. Paulson & Nace, PLLC*, 37 F. Supp. 3d 281, 290-91 (D.D.C. 2014), *aff'd*, 783 F.3d 897 (D.C. Cir. 2015). This test requires the court to consider such factors as: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; (5) the residence and place of business of the parties; and (6) the principal location of the insured risk." *Id.* at 291 (quoting *Adolph Coors Co. v. Truck Ins. Ech.*, 960 A.2d 617, 620 (D.C. 2008)).

These factors point in several different directions. The place of contracting, as I have noted, appears to have been Washington, D.C. *See* Subcontract & Rider 1. BDC is headquartered in D.C., but it is incorporated under the laws of Ohio. *See* Compl. ¶ 1. Baggette, meanwhile, is incorporated and headquartered in Alabama. *See id.* ¶ 2. And Hartford Fire Insurance, the surety for the prime contract, is based in Connecticut. *See* Compl. ¶ 2, *United States ex rel. Baker DC, LLC v. Hartford Fire Ins. Co.*, No. 17-2122-PWG (D. Md. July 27, 2017).

All of these localities have a connection to this case, but none, in my estimation, as substantial as Maryland's. *See* Restatement (Second) of Conflict of Laws § 188 (Am. Law Inst.

1971) (advising courts to evaluate the factors "according to their relative importance with respect to the particular issue"). This is a dispute about a subcontract for work to be performed in Maryland. The subcontractor seeks relief for delays and disruption it experienced on that work site. Under these circumstances, Maryland appears to have the strongest interest in the interpretation and enforcement of the subcontract, and so it is that state's law that I will apply.

**B.**

Turning to the substance of Baggette's motion, the first question is whether BDC's bid proposal is part of the subcontract.

"Under the parol evidence rule, a written agreement 'discharges prior agreements,' thereby rendering legally inoperative communications and negotiations leading up to the written contract." *Calomiris v. Woods*, 727 A.2d 358, 361-62 (Md. 1999) (quoting Restatement (Second) of Contracts § 213 (1981)). The rule, as Maryland courts have often noted, "is not a rule of evidence but is a rule of substantive law." *Foreman v. Melrod*, 263 A.2d 559, 562 (Md. 1970). Where applicable, it merges "[a]ll prior and contemporaneous negotiations" in the written instrument, "which is treated as the exclusive medium for ascertaining the extent" of the parties' obligations. *Id.* (quoting *Markoff v. Kreiner*, 23 A.2d 19, 23 (Md. 1941)). The effect is the same whether the prior agreements or negotiations were oral or written. *See* Restatement (Second) of Contracts § 213 cmt. a; *see also Hercules Powder Co v. Harry T. Campbell Sons Co.*, 144 A. 510, 516 (Md. 1929).

As this Court has previously noted, the Restatement (Second) of Contracts would bar courts from considering parol evidence of a prior agreement within the scope of a written, integrated agreement if, as a preliminary matter, the court concludes the latter is a "complete integration." *Alamria v. Telcor Int'l, Inc.*, 920 F. Supp. 658, 673 (D. Md. 1996) (citing Restatement (Second)

of Contracts §§ 210(3), 213(2), 216). An agreement is considered "completely" integrated where it is "adopted as the complete and exclusive statement of the terms of the agreement." *G.M. Pusey & Assocs., Inc. v. Britt/Paulk Ins. Agency, Inc.*, No. RDB-07-3229, 2008 WL 2003747, at *5 (D. Md. May 6, 2008) (quoting *Reutemann v. Lewis Aquatech, Inc.*, No. DKC2004-63, 2005 WL 1593473, at *3 (D. Md. July 5, 2005)). The focus of this inquiry is the parties' intent – i.e., "whether the parties intended their writing to be the final or complete expression of their agreement." *Reutemann*, 2005 WL 1593473, at *3 (quoting 1-5 Murray on Contracts § 8 (Lexis 2001)).

This subcontract, as Baggette is eager to note, contains an integration clause. That clause reads in part: "This Agreement constitutes the entire agreement between the parties hereto. No oral representations or other agreements have been made by Baggette Construction except as stated in the Agreement." Subcontract & Rider 9.

"Maryland law generally recognizes the validity and effect of integration clauses." *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 25 A.3d 967, 985-86 (Md. 2011); *see also AGV Sports Grp., Inc. v. Lemans Corp.*, No. GLR-11-16, 2013 WL 4176965, at *4 n.4 (D. Md. Aug. 13, 2013). These clauses, also known as merger clauses, offer compelling evidence that the parties intended "to finalize their complete understanding in the written contract and hence that there was no other prior or contemporaneous agreement not included in the written contract." *Pumphrey v. Kehoe*, 276 A.2d 194, 199 (Md. 1971). And that is especially the case in circumstances where, as here, "the same parties have entered into more than one agreement addressing the same subject." *Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 477 F. App'x 84, 88 (4th Cir. 2012).

This is not to say that the inclusion of an integration clause conclusively establishes the parties' intent to effectuate a fully integrated agreement. It does not. *See Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1024-25 (4th Cir. 1997); *MTB Servs., Inc. v. Tuckman-Barbee Constr. Co.*, No. RDB-12-2109, 2013 WL 1819944, at *8 (D. Md. Apr. 30, 2013). As the Fourth Circuit has observed, it is "generally true that 'a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties.'" *Ralph's Grocery*, 118 F.3d at 1024-25 (quoting Restatement (Second) of Contracts § 210 cmt. b (1981)). For example, in *Shoreham Developers, Inc. v. Randolph Hills, Inc.*, the Maryland Court of Appeals considered undisputed evidence that the seller of a tract of land explicitly sought to split the sale-and-finishing agreement into two agreements for tax reasons. 235 A.2d 735, 737 (Md. 1967). The agreements were executed on the same day and concerned the same property, and although one of them contained an integration clause, the court nevertheless treated the two agreements as one. *See id.* at 739.

Similarly, in *Rinaudo v. Bloom*, the existence of an integration clause in a written land sales contract did not prevent the Court of Appeals from considering testimony that, a few days after executing the agreement, the parties exchanged an additional $15,000 in cash over and above the amount cited in the written contract. 120 A.2d 184, 186-87 (Md. 1956). The court, observing that it is possible for an integration clause to "embody a recital of fact which may be untrue," applied a three-part test for identifying a "collateral" agreement: "(1) that the agreement be independent, separate and distinct from the original agreement, (2) that it be consistent with the provisions of that contract and (3) that it be such an agreement as the parties could not reasonably be expected to embody in the main contract and would naturally make a separate agreement." *Id.* at 189-90; *see Chartkof v. Spector Balt. Terminal, Inc.*, 284 A.2d 215, 219 (Md. 1971) (finding a "classic

case of a collateral agreement which was admissible despite the parol evidence rule and the integration clause," where one party demanded assurances that the other party was willing to provide but had reason to omit from the primary written agreement).

This case bears little resemblance to either *Shoreham* or *Rinaudo*. Here, unlike in those cases, we have three discrete exchanges: a subcontractor's bid proposal; a general contractor's subsequent "letter of intent" to award the subcontract to the subcontractor,[2] with a promise that a "formal subcontract shall be forthcoming"; and, finally, a written agreement with an integration clause. There is no indication, as there was in *Shoreham*, that either party sought to sever a single agreement into two or more parts. And I see no basis for treating BDC's bid proposal as a collateral agreement under the *Rinaudo* test, given the many ways in which its terms overlap with the written subcontract that followed.

In circumstances like these, federal courts applying Maryland law have found it appropriate to look to "[t]he circumstances of the instruments' drafting and the content of the written instruments" for indications that the parties either did or did not intent to enact a fully integrated agreement. *Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 738 F. Supp. 2d 640, 648 (D. Md. 2010), *aff'd*, 477 F. App'x 84 (4th Cir. 2012); *see ARB (Am. Research Bureau), Inc. v. E-Systems, Inc.*, 663 F.2d 189, 199 (D.C. Cir. 1980) (stating that Maryland law requires "the circumstances surrounding the making of the contract be considered to discover whether the

---

[2] BDC notes that Baggette's corporate designee, Alan Thurston, agreed in a deposition that the letter of intent was "in essence an acceptance of the bid." *See* ECF No. 54-4. It argues, accordingly, that the proposal and letter formed an enforceable bargain, and that the "execution of the formal subcontract was mainly considered at the time to be an administrative afterthought." Opp'n 9, ECF No. 54. But the question Baggette has presented in its motion is not whether the letter of intent gave rise to an enforceable agreement. Baggette's argument, essentially, is that the written subcontract, with its integration clause, superseded any and all prior agreements or negotiations. BDC's response in opposition to the motion largely ignores this question.

integration clause in question does, in fact, express the genuine intention of the parties to make the written contract the complete and exclusive statement of their agreement"). Factors bearing on this assessment may include the length of the written agreement, the extent of its detail, and the amount of time the parties spent negotiating the deal. *See ARB*, 663 F.2d at 199.

These factors all suggest the parties reasonably understood the written agreement would supersede any prior negotiations or agreements (other than those expressly incorporated by reference). The October 9, 2015 subcontract is 12 pages along, including a two-page "scope sheet" detailing the work BDC would need to complete. *See* Subcontract & Rider 1-12. The contract terms are divided into 24 sections covering a wide range of issues, such as Baggette's payment obligations; its authority to change the work orders; and BDC's duty to obtain necessary permits, maintain an insurance policy, and keep the premises clean. *See id.* at 1-9. The parties' briefing does not describe the negotiation process that led to the subcontract's execution, but it is clear they continued to review its terms for some time afterward, eventually adopting a rider that Baggette signed on October 14, 2015, and BDC signed on January 28, 2016. *See id.* at 15; *see* Compl. ¶ 9 (asserting the rider was executed on January 28, 2016).

BDC's response in opposition to Baggette's motion does not offer much, if anything, to counter the conclusion that the bid proposal was not part of the final subcontract. BDC dismisses this issue as a "*non sequitur* of the highest order," suggesting that the more salient question is not whether the bid proposal was part of the agreement, but "whether BDC was required to follow a so-called 'phasing plan' that was dictated on the fly by Baggette." Opp'n 1-2, 6, ECF No. 54. Accordingly, BDC spends much of its brief arguing that the "phasing plan" does not take "precedence over all other potentially competing contractual provisions" and that it is so indefinite as to render the contract illusory. *Id.* at 6-10. But the enforceability of the "phasing plan" is not

among the issues before me at this stage of the proceedings.[3] Baggette, as the moving party on a motion for partial summary judgment, has not sought a ruling on this question, and BDC has not filed a cross-motion. The issue Baggette has presented is whether the bid proposal is part of the subcontract. I conclude it is not,[4] and because BDC has not shown the existence of a genuine dispute of material fact, I grant partial summary judgment for Baggette on this issue.

## B.

The second issue raised in Baggette's motion has two related components, both concerning the type of evidence BDC must offer to establish its claim for delay and disruption damages. *See* Baggette Mem. 10-13. One issue is whether BDC must present expert testimony. The other is whether it can prove delay damages without evidence in the form of a "critical path method" ("CPM") analysis.

---

[3] BDC's argument that Baggette might have neglected a duty to verify the subcontractor's bid is similarly off point. *See* Opp'n 10-12. Again, it appears BDC seeks to discredit the phasing plan. As I have stated, though, that issue is not presented here.

[4] To be clear, the import of this conclusion is that the list of qualifications in the bid proposal, including the reference to a 16-week work schedule, is not within the scope of the subcontract and does not bind the parties. The parties should bear in mind, though, that I have not ruled on the separate, but related, issue of whether the bid proposal may be admissible to clarify ambiguities in the subcontract. *See Sidhu v. Shigo*, 484 A.2d 1033, 1038 (Md. Ct. Spec. App. 1984); *see also ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 404 (S.D.N.Y. 1999); *Smith v. Cent. Soya of Athens, Inc.*, 604 F. Supp. 518, 524 (E.D.N.C. 1985). Baggette's motion does, at one point, argue the bid proposal "is not relevant admissible evidence to *vary the terms* of the parties' Subcontract." Baggette Mem. 9 (emphasis added). But that is different than arguing that parol evidence of a prior communication or agreement between the parties is inadmissible to explain ambiguous terms in the written agreement. Under Maryland law, it is clear parol evidence is often admissible to resolve ambiguities. *See Calomiris v. Woods*, 727 A.2d 358, 362, 369 (Md. 1999). Should this case proceed to trial, it will be up to BDC to establish that one or more particular terms in the subcontract are ambiguous, and that parol evidence would help explain that term or terms.

**1.**

BDC informed the Court more than a year ago that it had chosen to rely exclusively on fact witnesses to present its case in chief. *See* ECF No. 37. Its response in opposition to the Motion for Partial Summary Judgment explains that its primary witness for the delay and disruption claim will be BDC Project Manager Jeff Sieve. Opp'n 12. Sieve, the company notes, "has been personally managing BDC's work on the Project, on a day-to-day basis, from the very beginning." *Id.* at 12-13. His testimony is "largely expected to track the analyses presented in the Requests for Equitable Adjustment (REA) that he prepared and submitted to Baggette on behalf of BDC." *Id.* at 13.

Baggette argues that, without an expert witness, there is no way BDC can meet its burden of proving damages to a "reasonable degree of certainty." Baggette Mem. 13; *see Kirby v. Chrysler Corp.*, 554 F. Supp. 743, 752 (D. Md. 1982) ("[D]amages must be proved with reasonable certainty, and may not be based on speculation or conjecture."). Baggette does not point to any binding precedent in support of this assertion.

One out-of-district case on which Baggette relies, *Flatiron-Lane v. Case Atlantic Co.*, does support the company's observation that courts generally expect expert testimony where a plaintiff seeks damages for lost productivity.[5] 121 F. Supp. 3d 515, 543 (M.D.N.C. 2015); *see also S. Comfort Builders, Inc. v. United States*, 67 Fed. Cl. 124, 144 (2005) ("Loss of productivity claims can be difficult to prove. Experts are generally relied on to develop and document such claim[s]."). That is not irrelevant here, as BDC's damages disclosure suggests (with less than total clarity) that

---

[5] "A claim of lost productivity is a claim arising out of a delay of a construction project that causes a contractor to alter its method of performance so as to proceed in a less productive manner; the contractor may claim its inefficiency as a delay damage." *Net Constr., Inc. v. C & C Rehab & Constr., Inc.*, 256 F. Supp. 2d 350, 354 (E.D. Pa. 2003).

the concrete subcontractor intends to recover for labor inefficiencies attributable to Baggette's delays. *See* Damages Disclosure 3, ECF No. 22. But Baggette has not identified any cases that held that expert testimony is required *as a matter of law*. *See S. Comfort*, 67 Fed. Cl. at 144 (going only so far as to state that loss of productivity is "almost always" proven by expert opinion testimony (quoting *Luria Bros. & Co. v. United States*, 177 Ct. Cl. 676, 696 (1966))). I note, too, that the *Flatiron-Lane* court was not ruling on a pre-trial motion for summary judgment. Rather, the court was entering judgment on a Rule 52(c) motion following the conclusion of a month-long bench trial. *See* 121 F. Supp. 3d at 520. Here, on a Motion for Partial Summary Judgment, I am unable to state as a matter of law that BDC cannot establish damages without offering expert testimony.

**2.**

Baggette argues, similarly, that BDC's claim for damages is unsustainable without evidence of a CPM analysis. CPM, to be clear, "is a term of art, not a legal concept." *Quinn Constr., Inc. v. Skanska USA Bldg., Inc.*, 730 F. Supp. 2d 401, 407 (E.D. Pa. 2010). Simply put, it is a "method of scheduling and administering construction contracts." *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1232 (10th Cir. 1999). Its function, primarily, is to enable "contractors performing complex projects to identify a critical path of tasks that must each be completed before work on other tasks can proceed." *Id.*; *see U.S. ex rel. Thorleif Larsen & Son, Inc. v. B. R. Abbot Constr. Co.*, 466 F.2d 712, 713 (7th Cir. 1972).

As one federal court long ago explained, contractors conduct a critical path analysis on a complex construction project by analyzing each of the various separate, but interrelated, small projects within the larger whole, considering the work involved and the expected duration of each subproject. *Haney v. United States*, 676 F.2d 584, 595 (Ct. Cl. 1982). The analysis seeks "to

determine the most efficient schedule for the entire project," recognizing that some subprojects cannot proceed until another has finished its course – for example, "one could not carpet an area until the flooring is down[,] and the flooring cannot be completed until the underlying electrical and telephone conduits are installed." *Id.* Subprojects that must be performed on schedule, lest they delay the entire project, are said to be on the "critical path." *Id.*

The U.S. Court of Claims has explained:

> The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path had an impact upon the time in which the project was completed. If work on the critical path was delayed, then the eventual completion date of the project was delayed. Delay involving work not on the critical path generally had no impact on the eventual completion date of the project.

*G.M. Shupe, Inc. v. United States*, 5 Cl. Ct. 662, 728 (1984).

Baggette draws on two Court of Federal Claims cases to buttress its assertion that BDC's claim for delay damages necessarily fails without CPM evidence. The first of these cases, *Southern Comfort Builders, Inc. v. United States*, observes that, in a case involving a "classic delay claim, *one established way* to document delay damages is through the use of [CPM] schedules, combined with an analysis of the effects of government-caused events upon the critical path of the project." 67 Fed. Cl. at 144. That is so. But this, of course, is not the same as declaring that a plaintiff *must* provide such evidence, as a matter of law, to prove damages of this variety. *See Howard Contracting, Inc. v. G.A. MacDonald Constr. Co.*, 71 Cal. App. 4th 38, 51-52 (1998) (rejecting argument that a general contractor had to produce a computer-generated CPM schedule to establish a claim for construction delay damages, where the contractor instead utilized a "bar chart schedule" based on a CPM analysis).

17

The other case, *Mega Construction Co. v. United States*, is less equivocal, stating that "determining the critical path is essential to determining damages." 29 Fed. Cl. 396, 425 (1993). There, in ruling on a post-trial motion for reconsideration, the court concluded that a general contractor's evidence of compensable delay, largely consisting of a bar chart and anecdotal testimony, "failed to provide the court with any credible coherent analysis of critical path delay, leaving to the court the well-nigh impossible task of identifying, quantifying, and assigning responsibility for critical path delay." *Id.* at 426.

*Mega Construction* is not binding on this court. Even if it were, though, I note that the plaintiff in that case was a *general contractor* overseeing a large and complex federal project. *See* 29 Fed. Cl. at 406 (noting that the plaintiff, as general contractor, "was responsible for coordinating and managing the work of the various subcontractors on the job site"). Under those circumstances, where the general contractor must establish that the alleged delays set back the entire project, the value is CPM analysis is easy to appreciate. *See G.M. Shupe*, 5 Cl. Ct. at 728. But Baggette has not identified any cases where a court required a *subcontractor*, such as BDC, to provide CPM evidence in a suit against a general contractor. In the absence of any case law to that effect, I am unwilling to state at this stage of the proceedings that, as a matter of law, BDC cannot possibly prevail on its claim for delay damages without evidence of a CPM analysis.

## CONCLUSION

Baggette has asked this Court to issue two findings as a matter of law. I agree with its first assertion that BDC's bid proposal is not a part of the parties' final agreement. At this stage, however, I am unwilling to declare as a matter of law that BDC cannot prove its claim for delay damages without expert testimony or evidence of a CPM analysis. Accordingly, Baggette's motion for partial summary judgment is granted in part and denied in part.

A separate order follows.

Date: March 28, 2019

_____
Paul W. Grimm
United States District Judge